255

Receipt Number
557123

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

SCANNED

Dr. Maimoona Husain,

Plaintiff,

v.

Michael Chertoff, in his capacity,
as the Director of the United States Department
of Homeland Security.

Vincent J. Clausen, in his capacity,
as the Field Office Director of the
U.S Immigration and Customs Enforcement
Detention and Removal Service.

Sandra M, Heathman, in her capacity,
as the Acting District Director of the
U.S. Citizenship and Immigration Service.

Kathleen L. Alcorn, in her capacity,
As the District Counsel for the
U.S. Immigration and Custom Enforcement Office.

Defendants.

Case: 2:07-cv-11917
Assigned To: Taylor, Anna Diggs
Referral Judge: Morgan, Virginia M
Filed: 05-02-2007 At 11:15 AM
CMP HUSAIN V. CHERTOFF, ET AL (TAM)

CIVIL ACTION FILE NO.

GERALD M. LORENCE (P16801)
Attorney for Plaintiff
30833 Northwestern Highway, Suite 121
Farmington Hills, Michigan 48334
(313) 961-9055

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Dr. Maimoona Husain,

Plaintiff,

v.

Michael Chertoff, in his capacity,
as the Director of the United States Department
of Homeland Security.

Vincent J. Clausen, in his capacity,
as the Field Office Director of the                         : CIVIL ACTION FILE NO.
U.S Immigration and Customs Enforcement
Detention and Removal Service.

Sandra M, Heathman, in her capacity,
as the Acting District Director of the
U.S. Citizenship and Immigration Service.

Kathleen L. Alcorn, in her capacity,
As the District Counsel for the
U.S. Immigration and Custom Enforcement Office.

Defendants.

GERALD M. LORENCE (P16801)
Attorney for Plaintiff
30833 Northwestern Highway, Suite 121
Farmington Hills, Michigan 48334
(313) 961-9055

## WRIT OF MANDAMUS

Pursuant to the Federal Rules of Civil Procedure, the plaintiff, by and through

her attorneys, Gerald M. Lorence, state as follows:

## JURISDICTION AND VENUE

1. This court has jurisdiction over this matter pursuant to 28 U.S.C.A. § 1651 (a).

2. The United States District Court for the Eastern District of Michigan is a proper venue for this action as a substantial part of the events or omissions giving rise to this action occurred in the Eastern District of Michigan.

## PARTIES

3. The Plaintiff, Dr. Maimoona Husain, a resident alien, resides in Michigan and applied for citizenship in the hope of becoming a naturalized citizen of the United States of America.

4. The Defendant, Michael Chertoff, the Director of the U.S. Department of Homeland Security, is being sued in his official capacity.

5. The Defendant, Vincent J. Clausen, Field Office Director of the U.S. Immigration and Customs Enforcement Detention and Removal Service, is being sued in his official capacity.

6. The Defendant, Sandra M. Heathman, as the Acting Director of the U.S. Citizenship and Immigration Service, is being sued in her official capacity.

7. The Defendant, Kathleen L. Alcorn, as the District Counsel for the U.S. Immigration and Custom Enforcement Office, is being sued in her official capacity.

## STATEMENT OF FACTS

8. In 1952, Congress passed the Immigration and Naturalization Act of 1952, which established a preference system, favoring skilled workers and the relatives of United States citizens and permanent resident aliens, and a controversial national-origins quota system, imposing a 150,000-person ceiling on immigration from the Eastern Hemisphere.

9. Along with its preference and quota systems, the Immigration and Naturalization Act of 1952 also authorized the deportation of any alien convicted of a "crime involving moral turpitude."

10. Courts have interpreted "crime of moral turpitude" to include fraud, murder, kidnapping, rape, prostitution, burglary, theft, and arson.

11. Pursuant to the 1952 act, this provision applies if the alien commits a crime of moral turpitude within five years of entry and is either sentenced to confinement or actually confined for a year or more.

12. An alien is also deportable if he or she commits two unrelated crimes of moral turpitude at any time after admission.

13. On March 1, 2003, under the auspice of the Homeland Security Act, Congress abolished the Immigration and Naturalization Service ("INS") and transferred its functions to the Bureau of Citizenship and Immigration Services (BICS) within the Homeland Security Department.

14. In May of 2002, plaintiff filed an application to become a naturalized citizen and was interviewed by the Detroit USCIS office in July 2003

15. Plaintiff passed the necessary examinations and fulfilled all the requirements mandated to become a Naturalized Citizen.

16. Pursuant to the Homeland Security Act, specifically 8 CFR § 335.3, a decision to grant or deny the application for naturalization shall be made at the time of the initial examination or within 120-days after the date of the initial examination of the applicant for naturalization under §335.2.

17. The 120 days waiting period expired in September of 2002, and no response was received by the Plaintiff.

18. Plaintiff traveled overseas in March of 2004, to assist her daughter, and upon her return to the United States, was detained by the Department of Homeland Security.

19. Plaintiff now faces removal proceedings, pursuant to section 212(a)(2)(A)(i)(II) of the Immigration and Nationality Act, which could send her back to Pakistan, her country of origin.

20. Because she has been entered into the Removal Proceedings, the Detroit USCIS office is barred from acting on Plaintiff's pending application to become a citizen of the United States of America

## COUNT I:

21. The allegations of paragraphs one through twenty are repeated as if fully set forth herein.

22. The defendant, or an agent thereof, in not responding to the plaintiff's application for Naturalized Citizenship within the statutory mandated time frame, has denied the plaintiff her rights to due process and to equal protection of the laws guaranteed by the Fifth Amendment to the United States Constitution.

WHEREFORE, the plaintiffs ask that this Court enter relief declaring that defendant grant Plaintiff a definitive answer regarding her Application for Naturalized Citizenship and/or grant a writ of *Audita Querela* and any other relief this Honorable Court deems proper.

## COUNT II

23. The allegations of paragraphs one through twenty two are repeated as if fully set forth herein.

24. Pursuant to 8 U.S.C. § 1422, eligible persons have a Federal Right to become naturalized.

25. Pursuant to 8 U.S.C. § 1421, each eligible applicant for Naturalization may choose to have the Oath of Allegiance administered by the United States District Court.

26. Pursuant to 8 U.S.C. § 1445(a)(c) & (d), the Attorney General shall make rules and regulations as may be necessary to conduct examination, to prescribe the scope and nature of the examination of applicants for naturalization as to their admissibility to citizenship and to conduct that examination.

27. Pursuant to 8 U.S.C. § 1421(c), a person whose application for naturalization is denied after a hearing (interview) before an immigration officer, has a right to review of such denial before the United States District Court for the District in which such person resides.

28. Pursuant to 8 C.F.R. § 310.5(a) and 8 C.F.R. § 336.1(a), if the Attorney General fails to make a determination before the end of 120 days and after the date of examination, the applicant has a right to apply to the United States District Court for the District in which the applicant resides for a hearing on the matter.

29. Pursuant to 8 C.F.R. § 316.14, the employee of the service who conducts the examination shall determine whether to grant or deny the application, under a non-discretionary standard.

30. The Defendants had a mandatory duty to process Plaintiff's application for Naturalization either for approval or to issue a denial within 120 days. If the Defendant had approved Plaintiff's application, plaintiff would not have been subject to subsequent removal deportation proceedings.

31. However, if the Defendant had denies Plaintiff's application for naturalization as is required by its non-discretionary duties under the statute and regulations, Plaintiff would have had a right of appeal of this denial to this United States District Court.

32. In failing to perform its duty as alleged, Defendant effectively denied Plaintiff her right to appeal to the United States District Court, the de facto denial of her naturalization application.

33. Further, in failing to perform its required duties to issue under the statute and regulations as was Plaintiff's right, Defendant created a reasonable belief on Plaintiff's part that there was no problem with either her naturalization application or her U.S. Lawful Permanent Residence Status.

34. In good faith and reasonable reliance upon that belief, plaintiff was induced by conduct of Defendant to depart the U.S. at her peril.

35. Defendants' now seek to use the action of Plaintiff in departing the U.S. and returning as basis to provide procedural opportunity for Defendants' to institute a process removal (deportation) action against Plaintiff in the Attorney General's Executive Office for Immigration Review Administrative Court.

36. Defendants' seek to benefit by this conduct wrongly and in bad faith, and in abuse of the process by effectively denying Plaintiff her right to challenge any claim of

ineligibility for naturalization on the law, facts and procedure in the appropriate statutory forum and procedures of the United States District Court.

37. Plaintiff is accordingly eligible for Judicial Assistance against the wrongful conduct of the Defendant by the United States District Court for relief in Writ of Audita Querela because to permit the Defendants' to proceed with removal (deportation) proceedings to Final Order of Deportation and Removal in the factual and legal context of this case would be contrary to justice and extreme case.

WHEREFORE, Plaintiff prays that this Honorable Court:

1. Issue its Order granting and ordering a stay of all proceedings against the Defendant in Removal Proceedings against the Plaintiff, in the Attorney General's Executive office for Immigration Review.

2. Issue its Order in Mandamus, ordering and directing Defendant U.S.C.I.S. to decide and issue its decision of Plaintiff's Application for Naturalization Nunc Pro Tunc effective retroactive to the mandated non-discretionary 120 day period following the date of Plaintiff's first interview with Defendant U.S.C.I.S.

3. Exercise its authority pursuant to the All Writs Act, 28 U.S.C § 1651 and grant Plaintiff's Writ of Audita Querela to prevent Defendants' from proceeding with the said removal (deportation) proceeding.

4. Grant such additional relief in Aid therefore as the Court determines to be fair and just to effect a remedy or remedies for Plaintiff as prayed.

5. Grant Plaintiff Equal access to Justice Attorney fees for Plaintiff's legal fees, cost and expenses wrongfully sustained as the direct proximate and foreseeable effect and result of Defendants' wrongful conduct as alleged and to be proven.

Respectfully Submitted,

BY: _Gerald M Lorence_

GERALD M. LORENCE (P16801)
Attorney for Plaintiff
30833 Northwestern Highway, Suite 121
Farmington Hills, Michigan 48334
(313) 961-9055

Dated: May 2, 2007

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Dr. Maimoona Husain,                          :
                                              :
Plaintiff,                                    :
                                              :
                                              :
v.                                            :   CIVIL ACTION FILE NO.
                                              :
Michael Chertoff, in his capacity,            :
as the Director of the United States Department :
of Homeland Security.                         :
                                              :
Defendant.                                    :

GERALD M. LORENCE (P16801)
Attorney for Plaintiff
30833 Northwestern Highway, Suite 121
Farmington Hills, Michigan 48334
(313) 277-3257

## Brief in Support of Complaint

### Statement of Facts

The Petitioner, Dr. Maimoona Husain, is asking this Honorable Court to grant her

estoppel of her deportation proceedings, and to issue a declaratory judgment ordering that

the DHS process her application for Naturalized Citizenship and give her an affirmative

answer in response to her application. Dr. Husain came to the United States in 1983, after

completing her medical education in Pakistan, to make a better life for herself and her

family. Upon her entrance into the United States, Dr. Husain completed a year of

Transitional Residency at South Macomb Hospital in Warren, Michigan and Detroit

Memorial Hospital in Detroit. In 1986, following her year of Transitional Residency, Dr.

Husain passed her Medical Licensing exams and was admitting to practice medicine in the State of Michigan.

In December of 1986, Dr. Husain took a job as a Physician with a clinic run by the American Health Centers. At this time, Dr. Husain was close to being nine months pregnant with her second child. Therefore, she did not expect to work at the facility for an extended period of time. After working there for a period of two weeks, Dr. Husain informed her employer that she would need to take a leave of absence due to the upcoming birth of her child. When told of this, her employer demanded that Dr. Husain would need to provide an individual at the clinic, who was identified as a "physicians assistant" with prescription blanks that were pre-signed to allow the clinic to still provide medical care during the time when Dr. Husain would be out due to the birth of her child. Dr. Husain testified that while she felt intimidated and pressured into filling out the applications and she in essence, had no choice in the matter. Furthermore, Dr. Husain was under the impression that when she was reviewing the records pertaining to each prescription, that each was a valid medical report and that their prescriptions were meant for real illnesses. Much to her surprise, however, the reports had actually been fabricated, and Dr. Husain had unwillingly taken part of a Medicaid fraud scheme orchestrated by the American Health Center.

Following the birth of her child, Dr. Husain returned to work with the American Health Center, and immediately informed her employer of her reservations regarding her employment and her desire to stop her employment with him. Upon being told of this, her employer threatened to sue unless she gave him thirty days advanced notice. Thereafter, Dr. Husain stayed for the subsequent thirty days and then left on her will and volition.

2

Upon leaving her employment with the American Health Center, Dr. Husain took a job with the Abrahamson Clinic, in Detroit, Michigan. While employed there, she learned that her previous employer was under investigation for fraud. Dr. Husain was contacted by the Attorney General, and without counsel present, gave full disclosure to what had happened while employed with her previous employer. Based on her conversations with the Attorney General, Dr. Husain was charged and subsequently convicted of Conspiracy to Defraud Medicaid, under MCL § 400.606 and Conspiracy to Deliver a Schedule III drug, under MCL §§ 750.157A and 333.74011, in October of 1989 by the Wayne County Circuit Court, in Detroit, Michigan. Dr. Husain was sentenced to five years of probation, which she satisfactorily completed in 1994.

As a result of her indictment, and before she was even convicted of a crime, Dr. Husain's license to practice medicine in the State of Michigan was suspended for one year in a consent agreement with the Michigan Medical Licensing Board. On the advice of her attorney, Dr. Husain chose to wait to file for her reinstatement to the practice of Medicine. Instead, Dr. Husain gave birth to twins and focused on the care of her children and the fulfillment of her probation. Thus, in 1997, Dr. Husain began the process to re-obtain her license to practice Medicine in the State of Michigan.[1] Dr. Husain has since committed herself to the practice of Medicine, completing her licensing requirements and passing the necessary medical education to become a full time Physician, as required by the Michigan Licensing Board, and has since been reinstated to the practice of Medicine within the State of Michigan.[2] She is currently employed at the St. Josephs Medical Center in Detroit as a full time physician. This clinic is located in Detroit's inner city, and

---

[1] See Attached Exhibit A (Medical Professional Packet)
[2] See Attached Exhibit B (Reinstated Medical License)

Dr. Husain frequently sees close to twenty patients a day, well above the number typically seen by a physician in a hospital. Moreover, Dr. Husain also is the primary care giver to her sister, who suffered a stroke in 2005 and can no longer care for herself.

In May of 2002, Dr. Husain filed an application to become a naturalized citizen and was interviewed by the Detroit USCIS office in July 2003.[3] Dr. Husain passed the necessary examinations and fulfilled all the requirements mandated to become a Naturalized Citizen. Yet, as of November of 2006, she has received no answer to her application. In the meantime, while waiting for a response on her application, Dr. Husain traveled overseas in March of 2004, to assist her daughter, and upon her return to the United States, was detained by the Department of Homeland Security.[4] While detained, she learned that she would be placed into Removal Proceedings due to her felony convictions. Moreover, because she has been entered into the Removal Proceedings, the Detroit USCIS office is barred from acting on Dr. Husain's pending application to become a citizen of the United States of America.

## 28 USCS § 2201 (The Declaratory Judgment Act)

Pursuant to 28 UCSCS § 2201, a litigant is entitled to what the court calls, a declaratory judgment. A declaratory judgment permit parties to a controversy to determine rights, duties, obligations or status. The United States Constitution, specifically Article III, Section 2 limits the exercise of the judicial power to 'cases' and 'controversies.' The Declaratory Judgment Act in its limitation to 'cases of actual controversy,' refers to the constitutional provision and is operative only in respect to controversies which are such in the constitutional sense. A justiciable controversy is thus

---

[3] See Attached Exhibit C (Immigration Application Material)
[4] See Attached Exhibit D (DHS Hold Paperwork on Dr. Husain)

distinguished from a difference or dispute of a hypothetical or abstract character; from one that is academic or moot. The controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests.

Furthermore, the controversy in question must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts. Aetna Life Insurance Co. v. Haworth, 300 U.S. 227, 57 S.Ct. 461, 81 L.Ed. 617 (1937). For adjudication of constitutional issues 'concrete legal issues, presented in actual cases, not abstractions' are requisite. The power of courts to pass upon the constitutionality of acts of Congress arises only when the interests of litigants require the use of the judicial authority for their protection against actual interference. A hypothetical threat is not enough. United Public Workers v. Mitchell, 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947).

A Federal District Court possesses discretion in determining whether and when to entertain an action under the Declaratory Judgment Act, even when the suit otherwise satisfies subject matter jurisdictional prerequisites. Wilton v. Seven Falls Co., 515 U.S. 277, 283 (1995). District courts have substantial latitude in deciding whether to stay or to dismiss a declaratory judgment suit in light of pending state proceedings (and need not point to "exceptional circumstances" to justify their actions). The Declaratory Judgment Act is "an enabling Act, which confers a discretion on the courts rather than an absolute right upon the litigant." Id. at 287. The Declaratory Judgment Act states only that a court may declare the rights and other legal relations of any interested party seeking such declaration. Where it is uncertain that declaratory relief will benefit the party alleging

injury, the court will normally refrain from exercising its equitable powers. <u>Penthouse Int'l, Ltd. v. Meese</u>, 939 F.2d 1011, 1020 (D.C, 1991)

### Dr. Husain and the Declaratory Judgment Act

Under <u>8 CFR § 335.3(a)</u>, upon an application for naturalization being entered to the appropriate parties .... [t]he Service officer shall grant the application if the applicant has complied with all requirements for naturalization under this chapter. A decision to grant or deny the application shall be made at the time of the initial examination or within 120-days after the date of the initial examination of the applicant for naturalization under <u>§ 335.2</u>. The applicant shall be notified that the application has been granted or denied and, if the application has been granted, of the procedures to be followed for the administration of the oath of allegiance pursuant to part 337 of this chapter.

Moreover, in <u>Daami v Gonzales</u> (2006, DC NJ) 2006 US Dist LEXIS 37539, an unpublished opinion, the presiding court held that the 120 day period of <u>8 C.F.R. § 335.3(a)</u> and <u>8 USCS § 1447(b)</u> under which Bureau of Citizenship and Immigration Services (CIS) had to decide naturalization applicant's case pursuant to <u>8 USCS § 1446</u> began to run from date of initial examination of applicant because (1) plain language of <u>§ 1447(b)</u> and implementing regulations strongly indicated that examination did not include background check by FBI, and (2) plain language of <u>8 USCS § 1446(a)-(d)</u> treated examination and background investigation as separate matters; thus, when CIS had not completed applicant's case while waiting for FBI background investigation, federal district court had jurisdiction over case pursuant to <u>8 USCS § 1447(b)</u>.

Furthermore, under <u>Castracani v Chertoff</u> (2005, DC Dist Col) 377 F Supp 2d 71, the U.S. Federal District Court has exclusive jurisdiction over alien's claim when Bureau

6

of Citizenship and Immigration Services did not take action on alien's application for citizenship within requisite 120 day period and alien filed action with court as result of Bureau's inaction. More specifically, 8 U.S.C. § 1447(b) states that "If there is a failure to make a determination under section 335 [8 USCS § 1446] before the end of the 120-day period after the date on which the examination is conducted under such section, the applicant may apply to the United States district court for the district in which the applicant resides for a hearing on the matter. Such court has jurisdiction over the matter and may either determine the matter or remand the matter, with appropriate instructions, to the Service to determine the matter.

In the present matter, the facts clearly show that the defendant had a duty to process the application filed for Naturalized Citizenship by the Plaintiff, and that the Defendant disregarded their duty. Pursuant to the Homeland Security Act, specifically 8 CFR § 335.3, a person is entitled to have their request for naturalization considered, and it must be done within a specific timeframe, that being 120 days. The plaintiff's application has been in the hands of the Defendant for well over the 120 period, yet she has never been given an affirmative response as to whether her application is accepted or denied. Now, as a result of the Defendant's unconscionable actions, the Plaintiff has been placed in serious jeopardy by leaving the country, as she did in 2004. Had the Defendant followed their own rules and regulations dealing with the Plaintiff's application for Naturalized Citizenship, the plaintiff, even if she were denied, would have been given access to other avenues, such as, her right to appeal the denial.

The actions taken by the defendant were gross and inappropriate. The Plaintiff should not be punished because the Defendant failed to fulfill their duties pursuant to

7

statutory law. Nor, should the Defendant be able to take advantage of its own misconduct. The Plaintiff is not asking the court to fight her deportation. Rather, the Plaintiff asks this Honorable Court to order the Defendant to properly adjudicate her naturalization and allow her what she is entitled to, that being the due process of the law. Should the court not wish to fulfill such a request, then the plaintiff would therefore ask for a second form of relief, that being a writ of *Audita Querella.*

### Usage of the writ of Audita Queerly

In it's original usage, under common law, the writ of *Audita Queerly* was a remedy granted in favor of one against whom execution has issued or is about to issue on a judgment the enforcement of which would be contrary to justice, either because of matters arising subsequent to its rendition, or because of prior existing defenses that were not available to the judgment debtor in the original action because of the judgment creditor's fraudulent conduct or through circumstances over which the judgment debtor had no control. 7 Am. Jur. 2d Audita Queerly § 1. The writ of *Audita Queerly* "served as a means by which judgment debtors could seek relief from a judgment that had become infirm since its entry by virtue of a discharge or other subsequent matter which for some reason could not have been raised at trial." United States v. Gonzalez, 152 Fed. Appx. 743, 745-46, (10th Cir. 2005) (citing *Black's Law Dictionary* 131 (6th ed. 1990)).

However, in its modern day usage, the writ of *Audita Queerly* is primarily used to challenge "a judgment that was correct at the time rendered but which is rendered infirm by matters which arise after its rendition.'"" Gonzalez, 152 Fed. Appx. at 746 (quoting United States v. Torres, 282 F.3d 1241, 1245 (10th Cir. 2002)(quoting United States v. Reyes, 945 F.2d 862, 863 (5th Cir. 1991))).

8

It should be noted that under <u>Fed. R. Civ. P. 60(b)</u>, the writ of *Audita Queerly* has been abolished. However, the writ of *Audita Queerly* survives in certain instances despite the 1946 amendments to the Federal Rules of Civil Procedure, which partly abolished several common law writs including *Coram Nobis* and *Audita Queerly*. Despite the 1946 amendments, the United States Supreme Court held in <u>United States v. Morgan</u>, 346 U.S. 502, 98 L. Ed. 248, 74 S. Ct. 247 (1954), that courts still have authority to issue writs of *Coram Nobis* in collateral criminal proceedings. <u>Id</u>. at 506-510. Writs of *Audita Queerly* and *Coram Nobis* "are similar, but not identical." <u>United States v. Reyes</u>, 945 F.2d 862, 863 n. 1 (5th Cir. 1991). Usually, a writ of *Coram Nobis* is used "to attack a judgment that was infirm [at the time it issued], for reasons that later came to light." <u>Id</u>. By contrast, a writ of *Audita Queerly* is used to challenge "a judgment that was correct at the time rendered but which is rendered infirm by matters which arise after its rendition." <u>Id.</u>

The <u>Morgan</u> Court initially noted that <u>Rule 60(b)</u> governs only civil proceedings. <u>Id</u>. at 505. The Court also expressly rejected the argument that the federal habeas statute, <u>28 U.S.C. § 2255</u>, had the effect of abolishing common law writs in criminal proceedings. *<u>Id.</u>* at 511. According to the D.C. Circuit, "the teaching of <u>Morgan</u> is that federal courts may properly fill the interstices of the federal post-conviction remedial framework through remedies available at common law." <u>United States v. Ayala</u>, 282 U.S. App. D.C. 266, 894 F.2d 425, 428 (D.C. Cir. 1990). For this reason, despite their seemingly anachronistic qualities, federal courts still have the authority to grant writs of *Audita Queerly*, generally pursuant to the All Writs Act, <u>28 U.S.C. § 1651</u>. *See* <u>Doe v. INS</u>, 120 F.3d 200, 203 (9th Cir. 1997); <u>United States v. Johnson</u>, 962 F.2d 579, 583 (7th

Cir. 1992); <u>United States v. Reyes</u>, 945 F.2d 862, 866 (5th Cir. 1991); <u>United States v. Holder</u>, 936 F.2d 1, 3 (1991).

      Pursuant to the "All Writs Act", "the Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." <u>28 U.S.C.A. § 1651 (a)(1994)</u>. While <u>Rule 60(b)</u> of the Federal Rules of Civil Procedure formally abolished the writ of *Audita Queerly,* the Supreme Court in <u>United States v. Morgan</u>, 346 U.S. 502, 74 S. Ct. 247, 98 L. Ed. 248 (1954), acknowledged the continuing availability of common-law post-conviction remedies under the All Writs Act. "<u>Morgan</u> stands for the proposition that the common law writs, such as *Coram Nobis* and *Audita Queerly* are available to 'fill the interstices of the federal post conviction remedial framework.'" <u>United States v. Valdez-Pacheco</u>, 237 F.3d 1077, 1079 (9th Cir. 2001)(quoting <u>Ayala</u>, at 428.). The All Writs Act enables federal courts to issue such commands as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained. <u>Gabhart v. Cocke County, Tennessee</u>, 155 Fed. Appx. 867, 872 (6th Circuit, 2005) Therefore, in other words, the common law writs survive only to the extent that they fill 'gaps' in the current systems of post-conviction relief. <u>Ayala</u>, at 428.

Ancilary Measures of Post-Conviction Relief

      When faced with the question of whether to grant a writ of *Audita Queerly*, a majority of the Courts have held that "a writ of *Audita Queerly* is 'not available to a petitioner when other remedies exist, such as a motion to vacate sentence under <u>28 U.S.C. § 2255</u>.'" <u>Villafranco v. United States</u>, 2006 U.S. Dist. LEXIS 23160.(US Dist. Utah,

10

2006). 28 U.S.C. § 2255 reads in part that, a prisoner, in custody under sentence of a court, established by Act of Congress, claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

The "essential function" of § 2255 "is to give a prisoner a reasonable opportunity to obtain a reliable judicial determination of the fundamental legality of his conviction and sentence." In re Davenport, 147 F.3d 605, 609 (7th Cir. 1998)(citing Carafas v. La Vallee, 391 U.S. 234, 238, 88 S. Ct. 1556, 20 L. Ed. 2d 554 (1968); Price v. Johnston, 334 U.S. 266, 283, 68 S. Ct. 1049, 92 L. Ed. 1356 (1948)).Torres, 282 F.3d at 1245 (quoting Tavares v. Massachusetts, 59 F. Supp. 2d 152, 155 (D. Mass. 1999)); *accord* Valdez-Pacheco, 237 F.3d at 1080 ("[A] federal prisoner may not challenge a conviction or sentence by way of a petition for a writ of *Audita Queerly* when that challenge is cognizable under § 2255 because, in such a case, there is no 'gap' to fill in the post conviction remedies . . . ."); Holt, 417 F.3d at 1175 ("The Fourth, Fifth, Seventh, Ninth, and Tenth Circuits have determined likewise that a federal prisoner may not use the writ of *Audita Queerly* where post-conviction relief is available through § 2255 or *coram nobis* motions."); United States v. Banda, 1 F.3d 354, 356 (5th Cir. 1993)("The writ of *Audita Queerly* permits a defendant to obtain relief against a judgment because of some legal defense arising after the judgment. . . . The writ is not available where . . . the defendant may seek redress under § 2255."). The Eleventh Circuit has reached the same

conclusion as well. *See* United States v. Jackson, 157 Fed. Appx. 252, 253 (11th Cir. 2005)("The writ of *Audita Queerly* . . . may not be granted when relief is cognizable under § 2255.").

28 U.S.C. § 2255 generally provides the exclusive means for a defendant to test his conviction in the sentencing court. The § 2255 remedy lies "unless it is shown to be inadequate or ineffective to test the legality of the prisoner's detention." Williams v. United States, 323 F.2d 672, 673 (10th Cir. 1963), *cert. denied*, 377 U.S. 981, 84 S. Ct. 1888, 12 L. Ed. 2d 749 (1964); 28 U.S.C.A. § 2255 P [5](Supp. 2005). Moreover, Courts have stressed that the remedy under § 2255 is "inadequate or ineffective" only in "extremely limited circumstances." Caravalho v. Pugh, 177 F.3d 1177, 1178 (10th Cir. 1999).

Thus, the availability of the § 2255 remedy precludes a prisoner in custody from petitioning for a writ of *Audita Queerly* . . . if the prisoner's claim could originally have been embraced by § 2255, even if that claim is now barred by successive filing restrictions. Once foreclosed, the writ does not rise like a phoenix to provide an additional avenue for redress simply because Congress chose to limit the reach of statutory remedies. United States v. Apodaca, 90 Fed. Appx. 300, 303 (10th Cir. 2004).

<u>The All Writs Act</u>

As such, if § 2255 is available as a remedy, then the petitioner is precluded from asking for a writ of *Audita Queerly*. Where, however, § 2255, is not available, a petitioner may still file for a writ of *Audita Queerly*, as was mentioned previously in regards to The All Writs Act. In issuing such a writ, the court must use its authority pursuant to the All Writs Act, sparingly and only in the most critical and exigent circumstances. Gabhart at

872.(citing <u>Wisconsin Right to Life, Inc. v. Federal Election Comm'n</u>, 542 U.S. 1305,

1306, 125 S. Ct. 2, 159 L. Ed. 2d 805 (2004)). The United States Supreme Court has

characterized the All Writs Act as one of the most potent weapons in the judicial arsenal.

<u>Id</u>. (citing <u>Cheney v. United States Dist. Court for the Dist. of Columbia</u>, 542 U.S. 367,

380, 124 S. Ct. 2576, 159 L. Ed. 2d 459 (2004)).  Additionally, the Supreme Court

specified the three conditions precedent to issuance of a writ pursuant to the statute: (1)

the party seeking issuance of the writ must have no other adequate means to attain the

relief he/she desires a condition designed to ensure that the writ will not be used as a

substitute for the regular appeals process; (2) the petitioner must satisfy the burden of

showing that his/her right to issuance of the writ is clear and indisputable; and (3) even if

the first two prerequisites have been met, the issuing court, in the exercise of its

discretion, must be satisfied that the writ is appropriate under the circumstances. <u>Id</u>.

Equity and the writ of Audita Queerly

The majority of the Courts of Appeals who have considered the question of

whether to grant the writ, have ruled that, as a matter of law, the writ of *Audita Queerly* is

not available to vacate an otherwise valid conviction for solely equitable reasons. *See*

<u>United States v. Johnson</u>, 962 F.2d 579 (7th Cir. 1992); <u>United States v. Reyes</u>, 945 F.2d

862 (5th Cir. 1991); <u>United States v. Holder</u>, 936 F.2d 1 (1st Cir. 1991). Moreover, in

<u>Doe v. INS</u>, 120 F.3d 200 (9th Cir. 1997), the Ninth Circuit concluded that "a writ of

*Audita Queerly*, if it survives at all, is available only if a defendant has a legal defense or

discharge to the underlying judgment." <u>Id</u>. at 204.

It should be noted, however, that a writ of *Audita Queerly* does not vacate

judgments, but the collateral consequences of judgments." <u>Ejelonu v. INS</u>, 355 F.3d 539,

13

552. Thus, a court "may mitigate a judgment's collateral consequences through a writ of *Audita Queerly* issued for equitable reasons, regardless of the presence of a legal defect in the original proceeding," Id. at 548. The writ may issue as to a judgment in a criminal case "which it would be contrary to justice to allow to be enforced, because of matters arising subsequent to the rendition thereof." Oliver v. Shattuck, 157 F.2d 150, 153 (10th Circuit). But the "'matter of defense or discharge arising since its rendition and which could not be taken advantage of otherwise,'" Holder, 936 F.2d at 2 (quoting *Black's Law Dictionary* 120 (5th ed. 1979)), is not limited solely to a "legal defect in the conviction, or in the sentence which taints the conviction," Johnson, 962 F.2d at 582, that could not have been raised in the original proceeding. Other matters of defense or discharge may be raised as well, *e.g.*, subsequent legislation affecting the collateral consequences of a conviction. Thus, a writ of *Audita Queerly* may sensibly be distinguished from other post-conviction remedies, such as the writ of error *Coram Nobis*. As Elejonu points out, "*Coram Nobis* attacks the judgment itself, whereas *Audita Queerly* attacks the consequences of the judgment."

Recent Case law in favor of the writ of Audita Queerly

The Sixth Circuit Court of Appeals has recently held in Ejelonu v. INS, 355 F.3d 539, that a writ of *Audita Queerly* is available "to mitigate the collateral consequences of an earlier criminal conviction when failing to do so would have produced an unconscionable result," regardless of the legal or equitable validity of the conviction itself. Id. at 548. In, Ejelonu, the petitioner was an 18 year old girl from Nigeria who had legally immigrated to the United States at the age of six, as a dependant under her parent's student visa. The petitioner's parents became naturalized American citizens on

14

September 11th, 1996, and soon thereafter, in October of that same year, they filed for Applications for Certificates of Citizenship on behalf of the Petitioner and her two siblings. However, the INS, the predecessor to the Department of Homeland Security did not schedule the appropriate interviews until approximately ten months later, in August of 1997.

During the time of the INS's delay in setting up the interview, but after the time in which the original application was filed, the petitioner turned Eighteen years old, thereby disqualifying her, under section 322(a) of the Immigration and Naturalization Act, from becoming a naturalized citizen. Under section 322(a), the INS had the right to require a child seeking citizenship to be "under the age of eighteen and in the legal custody of the citizen parent." Therefore, because she had turned eighteen by the time the INS had decided her application, the petitioner's request for citizenship was refused and the INS warned her that it would soon begin deportation proceedings.

Meanwhile, during the time in which the petitioner's application was being submitted and subsequently denied, she graduated with honors from her high school and began taking college courses at Wayne State University. While in school, the petitioner worked two jobs, both in the retail field. While working at one of her retail jobs in the summer of 1998, the petitioner waited on a family that resided in her neighborhood. When it came time for the family to pay, they asked the petitioner to accept a credit card number without the credit card. The petitioner knew that this violated the store policy, however she felt that the family was trustworthy and did as she was asked. Later in the week, the same family came back and asked the petitioner to repeat the earlier transaction, and again she accepted a credit card number without the actual credit card for

the purchase of store merchandise. It should be noted, that the petitioner never received any money or a share of the stolen goods for permitting the transactions in question.

The petitioner was subsequently arrested and charged with two counts of embezzlement by an agent or trustee of over $100. She plead guilty under Michigan Compiled Laws § § 762.11-14, otherwise known as the Holmes Youthful Trainee Act (HYTA). This provided that if "an individual pleads guilty to a charge of a criminal offense…committed on or after the individual's seventeenth birthday but before his or her twenty-first birthday" that the court has the authority to "assign that individual to the status of a youthful trainee" and to do so "without entering a judgment of conviction. MCL § 762.11. Under her plea, the petitioner was placed on probation and required to make restitution. However, before she could start this proceeding, her "sealed" record was given to the INS, who raided the petitioner's home, seized her by force and initiated the deportation proceedings.

Upon the commencement of the removal proceedings, the petitioner was tried before an immigration judge, and based upon her convictions, was found to be deportable in August of 2005. The petitioner then subsequently filed an appeal to the Board of Immigration Appeals. However, the Board of immigration Appeals denied her request, which then left her only option being to ask the Sixth Circuit Court of Appeals to review her case. Upon their review, the Sixth Circuit ruled that, based on the facts of the case, those being the petitioner's age, the purpose of the HYTA status, the danger faced by the petitioner should she had been deported and the delay caused by the INS in granting the necessary interview, that there was sufficient equity on behalf of the petitioner to grant

16

her request and force the INS to cease the deportation proceedings under the mandate of
the writ of *Audita Queerly*.

The Court reasoned that the history of the use and application of the writ supports
its equitable nature, including its issuance based upon factors independent of the presence
of a legal defect in the original proceeding. Id. at 545-550. More specifically, the court
reasoned that a court of law "may mitigate a judgments' collateral consequences through
a writ of *Audita Queerly* issued for equitable reasons, regardless of the presence of a legal
defect in the original proceedings. Id. at 548. The Court also concluded that this
characterization of the writ did not violate separation-of-power principles, as Congress
may prohibit courts from issuing writs of *Audita Queerly* with respect to the collateral
consequences of criminal convictions, just like it did with respect to ordinary civil
proceedings through Federal Rule of Civil Procedure 60(b). Id. at 552. Nonetheless, the
Court emphasized that it was not fashioning an easy mechanism for convicted aliens to
avoid deportation, as the writ remains unavailable if "deportation is either not
unconscionable or where DHS can articulate any legitimate reason for its decision to
deport." Id.;

Several courts have granted a writ of *Audita Queerly* for the same purpose, that
being to mitigate a collateral consequence of an earlier criminal conviction when failing
to do so would have produced an unconscionable result. In United States v. Salgado, 692
F. Supp. 1265 (1988), the petitioner was granted a writ of *Audita Queerly* to stop his
deportation based on a twenty-four year old conviction. The petitioner had immigrated to
the United States in 1939, and had made a life for himself in this country, paying taxes,
including but not limited to social security taxes. In 1964, the petitioner was arrested for a

17

possession of marijuana charge and subsequently pled guilty to the charge. Following the plea, the petitioner voluntarily left the country for a period of five years. In 1969, he re-entered the country and lived as a productive member of society for the decades following his conviction. When he applied for Social Security benefits in 1984, the INS discovered that it should have deported him, and therefore began the process to do so. In making their decision the court held that based on the "totality of the circumstances, it would be a great injustice to allow this man, who has by all accounts been a model resident for forty-five years save for a single period of unlawful conduct, to effectively serve a life sentence" based on the inadequacies of the INS.

The ruling by the court in Salgado, also showed that the writ of *Audita Queerly* was a necessary tool to ensure that specific rights were given to those that had earned them. The court clearly stated that such was the case with the petitioner and his rights to the social security benefits which he had been paying into for the numerous years he had lived and worked in the United States. In essence, the court held that it is only fair and equitable that a right given to an individual who has lawfully been entitled to it, should be allowed to take full advantage of that right, based, of course, on the circumstances of the situation.

Furthermore, in United States v. Ghebreziabher, 701 F.Supp. 115, 117 (E.D. La. 1988), the court held that the writ of *Audita Queerly* was available when the avoidance of consequences of criminal conviction serves interests of justice. Ghebreziabher involved an Ethiopian native who entered the United States in 1979. Id. at 116. Ghebreziabher initially worked in a shipyard before starting his own successful business and purchasing a home. Id. He also married and had four children. In 1987, however, he pleaded guilty to

18

three misdemeanor counts of food stamp trafficking. Ghebreziabher had accepted food stamps in exchange for $220 worth of merchandise without authorization. Ghebreziabher received probation and had to repay the $220. Id.

Despite the government's arguments in support of Ghebreziabher's deportation, the court relied on various equitable considerations to reach a different outcome. The court felt that Mr. Ghrebreziabher has been an industrious member of this community for almost ten years. He has four United States citizen children who will be deprived of his support if he should be deported. He has realized the American dream, owning his own home, and has reduced the mortgage on it from $ 58,500.00 to $ 33,000.00 in approximately six years. Except for these three incidents, he has no convictions. His former employer, a subsidiary of a shipyard where he worked as a carpenter and joiner, thought well of him and found him to be hard-working... It is also likely that his family will suffer tremendously should he be deported and removed from the home. Id. at 117. On this basis, the court found it "in the interests of justice" to issue a writ of *Audita Queerly.*

In United States v. Javanmard, 767 F. Supp. 1109 (D. Kan. 1991), the US District Court was asked to help avert collateral consequences, suffered as a result of a previous conviction, and did so. *Javanmard* involved a situation similar to this case (and *Salgado/Ghebreziabher*), in which the INS sought to deport someone based on a minor criminal conviction. Id. at 1110. The court refused to grant a writ of *Audita Queerly* under the mistaken belief that it could do so only if a legal error occurred in the initial proceeding. Id. at 1110-11. Nevertheless, the court held that "it appears to be generally conceded, and the government at hearing also conceded, that the district courts have the

power to afford the relief required here on equitable grounds under the All-Writs Act, 28 U.S.C. § 1651(a)." Id. at 1111. According to the court, "given all of the circumstances of this case, the court finds that the equitable considerations weigh in favor of Mr. Javanmard's interest in obtaining . . . relief, as opposed to the government's interest in maintaining a criminal record." Id. at 1112. Since "this court finds it has wide latitude under the All-Writs Act to construct any remedy necessary to 'achieve justice[,]' . . . . Mr. Javanmard's conviction may and should be vacated." Id. at 1111. Therefore, the *Javanmard* court declined to issue a writ of *Audita Queerly* on the misguided theory that it could not do so without finding a legal error in the initial proceeding--yet the court still found it had equitable power to halt the collateral consequences of the conviction. In fact, the court not only prevented the collateral consequences of Javanmard's conviction, it agreed to *vacate* the conviction entirely pending Javandmard's satisfaction of an earlier restitution order. Id. at 1112.

<u>Relevant Factors necessary for a writ of Audita Queerly</u>

The Courts have held that there needs to be shown three things in order to make a case for issuance of the writ of *Audita Queerly*, thereby relieving oneself from the continued enforcement of the judgment in his criminal proceeding. First, it must be shown that there was a matter of valid defense or discharge arising only after the entry of the judgment in his criminal proceeding. Second, it must be proven that it would be "unconscionable" -- that is, "against conscience" or "contrary to justice" -- "to execute such [a] judgment," Third, it must be shown that for reasons which he/she could not previously have raised in his/her original criminal proceeding, on direct appeal, or

otherwise that such a defense could not have been raised. Humphreys, 50 U.S. at 313; Oliver, 157 F.2d at 153.

Therefore, when ruling on an application for a writ of *Audita Queerly*, the courts will often look to the following non-exhaustive list of factors to determine whether to grant the writ: government's interest in maintaining the petitioner's conviction; government's position on whether relief should be granted; petitioner's actions before and subsequent to the conviction; time that has elapsed since the petitioner's conviction; hardship to the petitioner's family that will result from his or her deportation; nature of crime for which petitioner was convicted; other alternatives for obtaining relief; and the existence of a newly created right to which petitioner would be entitled absent the conviction. See Ira Robbins, *The Revitalization of the Common-Law Civil Writ of Audita Querella as A Post-Conviction Remedy in Criminal Cases: The Immigration Context and Beyond,* 6 Geo. Immigr. L.J. 643, 685-686 (1992) (listing factors and discussing importance).

<u>Analysis of the Present Case</u>

As was stated previously, the writ of *Audita Queerly* can be granted by the courts under the auspice of the All Writs Act. Upon looking at the facts and circumstances of the present case, it is evident that the remedies available under the all writs act should be available to Dr. Husain. First of all, Dr. Husain is no longer serving a sentence for her convictions. She was discharged from her probation following its successful completion. Therefore, the remedies available to her under 28 U.S.C. § 2255 would be considered mute, leaving only the writ of *Audita Queerly* as an available remedy. Next, because the issue of deportation is a federal, and not a state matter, a federal court is the proper venue

for this matter. Moreover, when taken in conjunction with the lack of any other available remedies and the equities which Dr. Husain possesses, it is evident that Dr. Husain's right to the issue of a writ under the all writs act is clear and indisputable. Furthermore, based on the facts of the case and the type of writ which Dr. Husain is requesting, the issuance of such a writ would clearly be appropriate under the circumstances of this matter.

To qualify for a writ of *Audita Queerly*, a petitioner must show the following: First, that there was a matter of valid defense or discharge arising only after the entry of the judgment in his criminal proceeding. Second, it must be proven that it would be "unconscionable" -- that is, "against conscience" or "contrary to justice" -- "to execute such [a] judgment," Third, it must be shown that for reasons which she could not previously have raised in her original criminal proceeding, on direct appeal, or otherwise that such a defense could not have been raised. Humphreys, 50 U.S. at 313; Oliver, 157 F.2d at 153.

While the crux of this matter is that of a criminal nature, to fulfill that which the court requires to prove to be granted a writ of *Audita Queerly*, it would be prudent to look to the immigration laws upon which the possible deportation of Dr. Husain is based. Congress enacted the Immigration and Nationality Act of 1990 in an effort to streamline the immigration process to the United States. Under this act, it is required that all individuals applying for citizenship must be able to prove good moral character. Previous to the act's inception though, existed a similar requirement. However, previous to 1990, the only individuals precluded from establishing good moral character were aliens who convicted "at any time for murder". After the 1990 Act was passed, the definition was expanded to numerous aggravated felonies and included attempts and conspiracies to

22

commit such crimes, whether in violation of state or federal laws. However, under § 509 (b) of the 1990 act, the changes only precluded establishment of good moral character if the offense was committed after November 29, 1990, the date the act was enacted. Thus, any offense prior to that date would therefore not preclude an alien from establishing good moral character for naturalization.

As was previously stated, in granting a writ of *Audita Queerly*, the courts will first look to see whether there was a matter of valid defense or discharge arising only after the entry of the judgment in his criminal proceeding. In <u>United States v. Haro</u>, CR No. 85-00612 WJR (C.D. Cal, May 30, 1990), the court held that basic principle of a writ of *Audita Queerly* was "that there had been a satisfaction of the judgment." Thus, in the criminal context, the court found that this satisfaction to be the serving of the sentence; after the sentence is served, the defendant can be said to have been discharged.

Dr. Husain faces the likelihood of a deportation from this country, one which she has given so much of her adult life. Under her original conviction, Dr. Husain was sentenced to period of probation to be served over a five year period. No mention was ever made of a deportation, because, at the time of her convictions, the crimes for which Dr. Husain was convicted, would not have made her ineligible to be granted citizenship. Furthermore, even after the law was changed, and the crime she had committed would have made her eligible to be deported, Dr. Husain's convictions would not have been held against her, because her conviction was well before the cutoff date and the law did not apply retroactively.

Clearly, the courts did not intend for her conviction to result in her deportation. The court issued the sentence to punish Dr. Husain for the crimes she had committed. Dr.

23

Husain served her court mandated punishment without any problems and has since gone on to lead a fulfilling and successful professional and personal life here in Michigan. Therefore, she had met the requirements put forth to her by the court and upon completion, was "discharged" from any further punishment. Yet, by allowing for the deportation of Dr. Husain, the courts would, in essence, be sentencing her to a life sentence for a crime upon which time has all ready been served. This new "secondary sentence" could not have been brought up at the time of trial, because at that time, the crimes committed would not have barred Dr. Husain from being granted citizenship based on her moral character. As such, Dr. Husain would therefore fulfill the first requirement necessary for a writ of *Audita Queerly*.

Next, to be granted a writ of *Audita Queerly*, the petitioner must prove to the court that it would be "unconscionable" -- that is, "against conscience" or "contrary to justice" -- "to execute such [a] judgment," Humphreys, 50 U.S. at 313. In the present situation, Dr. Husain went to trial and was found guilty by a jury of her peers. The court issued a sentence of probation to be served over a five year period. Once, the probation period was completed, Dr. Husain was considered a free woman. Yet, because of her conviction, Dr. Husain now faces the threat of deportation. As was mentioned above, the idea of deportation was never an issue at the time of her conviction, because the law at the time, did not consider her crime/conviction one which constitutes a showing of bad moral character. Therefore, to deport Dr Husain after she had all ready served her sentence would be considered unconscionable and would certainly be contrary to what the court had intended for her punishment to be.

24

Moreover, how Dr. Husain has lived her life following the completion of her sentence should be given its due credit, as it relates to the goals of the judiciary system in handing out specific punishments for specific crimes. Dr. Husain is a happily married woman and a mother to four beautiful children. She is a valuable member of her community, not only because of her role as a physician but for her community involvement and activity as well.[5] Dr. Husain has focused her practice in the inner city areas of Detroit, unlike many of her professional colleagues, who have left the inner city to pursue more lucrative work in the suburbs. She has remained where she is needed the most, not where she would receive the most compensation. Her naivety as a young resident cost her dearly and resulted in a conviction where her medical license was suspended. She knows her actions were wrong, but she has done her utmost to demonstrate that she is a vital member of the community and a great citizen of humanity.

To deport Dr. Husain back to Pakistan, would in essence, condemn Dr Husain to a sentence equal to a solitary confinement, or worse, a sentence of death, something the court would never have issued, based on the nature of her conviction. Dr. Husain has no remaining family in Pakistan. Any and all relatives are living in the United States, including but not limited to her own husband and children. Dr. Husain would be forced to return to a country where her cultural background, that being a Shi'a, and her education, would put her in the minority. The Shi'a community makes up between five and ten percent of the population of Pakistan. The Sunni Community, of which a majority of Pakistan's citizens are considered, compromises close to eighty five percent of Pakistan's population.[6]

---

[5] See Attached Exhibit E (Community Service Letters and Accolades)
[6] See Attached Exhibit F (Amnesty International Article concerning Killing of Doctors in Pakistan)

Moreover, because of the political climate currently present in Pakistan, those factors could very well lead to her death. Amnesty International, has documented close to 100 murders of members of the Sha'i minority in the Karachi area of Pakistan, over the past decade. [7] Medical Doctors constitute the single largest group of victims of these targeted killings, far outnumbering any other of the high profile professions upon which these killings have focused.[8] Furthermore, it is a widely held notion that the killings of members of the Shi'a minority are not incidental but part of a pattern of violence which has affected many people beyond the direct targets. It has contributed to a climate of fear, which has deeply impacted the lives of people, particularly in Karachi, which is where Dr Husain was from and therefore would be forced to return to, should the court not estopp the deportation process.

Based on these facts, it would be hard for the respondent to argue that the deportation of Dr Husain to Pakistan could be considered fair and within the realm of punishment typical for a conviction such as hers. Dr. Husain has made a good life for herself following her conviction, and has not violated any of the United States. Clearly Dr. Husain's equities are strong, and prove that she has been rehabilitated, which was the primary goal in her initial punishment. As such, it is evident that Dr. Husain fulfills the second requirement to be granted the writ of *Audita Queerly*.

Lastly, to meet the requirements set for by the court to be granted a writ of *Audita Queerly*, it must be shown that for reasons which could not previously have raised in the original criminal proceeding, on direct appeal, or otherwise, that such a defense could not have been raised. Humphreys, 50 U.S. at 313; Oliver, 157 F.2d at 153. To repeat what

---

[7] See Attached Exhibit F
[8] See Attached Exhibit G (Articles regarding the Killing of Doctors in Pakistan)

has been previously raised, under the laws in place at the time of the conviction, the crimes committed by Dr. Husain would not have barred her from showing her good moral character and therefore could not be used against her in a deportation proceedings. Thus, to appeal her conviction based on immigration issues would have been frivolous and fruitless. If deportation were even to be considered, it would have been brought up in the sentencing phase, and it was not. The court did not envision any immigration related issues, and set the proper sentence accordingly. Therefore, Dr. Husain could have never brought this up at any point during the trial or appeals phase of her conviction. Thus, she fulfills the third and final requirement put forth by the courts to be granted a writ of *Audita Queerly*.

### Petitioner's Denial of her Due Process Rights

As was discussed earlier in regards to <u>Salgado</u>, the Courts have granted the writ of *Audita Queerly* in situations where the writ is needed to ensure that a right owed to or earned by the petitioner is, in fact, given out. Thus, in the present situation, the petitioner, Dr. Husain, contends that she has a right to an answer regarding her Application for Naturalization and Citizenship, and therefore, through the writ of *Audita Queerly*, should be given a final answer, whether it is affirmative or negative.

Under <u>8 CFR § 335.3(a)</u>, upon an application for naturalization being entered to the appropriate parties …. [t]he Service officer shall grant the application if the applicant has complied with all requirements for naturalization under this chapter. A decision to grant or deny the application shall be made at the time of the initial examination or within 120-days after the date of the initial examination of the applicant for naturalization under <u>§ 335.2</u>. The applicant shall be notified that the application has been granted or denied

and, if the application has been granted, of the procedures to be followed for the administration of the oath of allegiance pursuant to part 337 of this chapter.

Moreover, in Daami v Gonzales (2006, DC NJ) 2006 US Dist LEXIS 37539, an unpublished opinion, the presiding court held that the 120 day period of 8 C.F.R. § 335.3(a) and 8 USCS § 1447(b) under which Bureau of Citizenship and Immigration Services (CIS) had to decide naturalization applicant's case pursuant to 8 USCS § 1446 began to run from date of initial examination of applicant because (1) plain language of § 1447(b) and implementing regulations strongly indicated that examination did not include background check by FBI, and (2) plain language of 8 USCS § 1446(a)-(d) treated examination and background investigation as separate matters; thus, when CIS had not completed applicant's case while waiting for FBI background investigation, federal district court had jurisdiction over case pursuant to 8 USCS § 1447(b).

Furthermore, under Castracani v Chertoff (2005, DC Dist Col) 377 F Supp 2d 71, the U.S. Federal District Court has exclusive jurisdiction over alien's claim when Bureau of Citizenship and Immigration Services did not take action on alien's application for citizenship within requisite 120 day period and alien filed action with court as result of Bureau's inaction. More specifically, 8 U.S.C. § 1447(b) states that "If there is a failure to make a determination under section 335 [8 USCS § 1446] before the end of the 120-day period after the date on which the examination is conducted under such section, the applicant may apply to the United States district court for the district in which the applicant resides for a hearing on the matter. Such court has jurisdiction over the matter and may either determine the matter or remand the matter, with appropriate instructions, to the Service to determine the matter.

Thus, in the present case, the case law clearly favors Dr. Husain in her contention that she should have been given an answer regarding her Application for Naturalization. Just as the petitioner in Salgado was granted the writ of *Audita Queerly* to afford him his rights to what he is entitled to, so should the writ help Dr. Husain. It is evident that the officials in charge of Dr. Husain's application did not meet their responsibilities in processing her application, within the required 120 day period. Dr. Husain filed her application in May of 2002, yet it is early 2007 and she has yet to be given a conclusive answer. Clearly, the 120 day time limit has come and gone, and as such, Dr. Husain is entitled to and therefore should be given an immediate answer. By looking at the equities of the case, and taking into account all of the harm the DHS has caused by not fulfilling their responsibilities in the Immigration process, it is evident that Dr. Husain is entitled to all that she is asking for, that being an affirmative answer to her application, under the auspice of the writ of *Audita Queerly*.

Remedy

The case of Dr Husain is one which is strife with reasons to grant the writ of *Audita Queerly*. Dr. Husain has fulfilled all the requirements which the court has put forth. To deport her would go against everything the trial court had set out to do when it handed down its initial sentence. Yet, the government still wishes to punish Dr. Husain further, by deporting her back to Pakistan, her country of origin. Dr. Husain has made every effort, and done everything that was asked of her, to become a citizen of this country. Now she faces deportation, and is running out of options to stop the deportation from occurring. Therefore, the writ of *Audita Queerly* is the only option left available for Dr. Husain in her fight to stop her deportation from a country she has lived in, and

29

dedicated her time and resources to, for the past twenty five years. Dr. Husain is no longer serving under the careful watch of the justice system, as she completed her probation as it related to her conviction. Therefore, any remedies available under <u>28 U.S.C. § 2255</u> have become moot. Hence, the only option left available to Dr. Husain is the equitable remedy of a writ of *Audita Queerly*, as allowed under the All Writs Act, <u>28 U.S.C.A. § 1651 (a)(1994)</u>.

## Relief Requested

**WHEREFORE**, the Plaintiff, Dr. Maimoona Husain, respectfully requests this Honorable

Court to do either of the following:

1. Order the Defendant to process the Plaintiff's Application for Naturalized

   Citizenship; and/or

2. Issue a writ of *Audita Querella* in regards to Plaintiff's convictions and their

   subsequent immigration repercussions arising there from.


Respectfully Submitted,

Gerald M. Lorence (P16801)
Attorney for Defendant/Appellant
30833 Northwestern Highway, Suite 121
Farmington Hills, Michigan 48334
(313) 961-9055

## Exhibit A

Medical Professional Documents

- *Curium Vitale*
- *Clinical Rotation Sheets*
- *Continuing Medical Education Logs and Accreditations*

## MAIMOONA  HAKIM  HUSAIN M.D.
10077 Aberdeen drive, Grand Blanc, MI 48439
(810)   695 – 8147

**Licensed Physician**

Sheet 1 of 4

**ABDULLAH  RAFFEE, M.D., F.A.C.P.,  P.C.**
**Internal Medicine + Geriatric Medicine**
**5051 Villa Linde North, Suite 23, Flint, MI 48532**

**2/00 - Present**

Working under Dr.  Rafee.

## Medical Training/ Education Program:   10/26/1998 - 12/07/1999

- **INTERNAL MEDICINE  + GERIATRIC:**        **8/30/99 - 12/7/99**
**DR. ABDULLAH RAFFEE:  PHONE # 810 - 733 - 8241**
Patient's Physical assessment,  examination and medical record documentation.
Learn the management of various internal medicine diseases.  Learn referral system
management.  Attend Case Management conferences and participate in discussion.
Discuss clinical assessment, differential diagnosis and treatment Options with
Supervising Physician.

- **NEUROLOGY:**        **7/12/99 - 8/27/99**
**DR. RAMESH CHHEDA: PHONE # 810 - 232 - 0040**
Patient's Physical assessment and medical record documentation.  Patient Physical
examination and detailed neurological evaluation.  Review  Brain MRI and CATSCAN
with Supervising Physician.  Observe &  Review  EEG's, EMG's and Nerve
Conduction Study with Supervising Physician.  Self Study by watching Educational
Videos on: a) Neurological Exam; b) Different types of Epilepsy's and their
treatments; c) ADHD; d) Obsessive  Compulsive disorder; e) Anxiety Disorders and f)
Phobias. Discuss with Supervising Physician:  management of ADHD,  Migraine,
Epilepsy, Psychosis,  Mood Disorder, Myopathy,  Upper Motor & Lower Motor
Lesion. Discuss clinical assessment, differential diagnosis and treatment Options
with Supervising Physician.

- **CARDIOLOGY + INTERNAL MEDICINE:**        **06/21/99 - 07/09/99**
**DR. MOHAMMADALI  AMLANI: PHONE # 810 - 732 - 5400**
Patient's Physical assessment and medical record documentation.  Patient Physical
examination and detail Cardiological evaluation.  Observe Cardiac Catherterizations,
AngioPlasties, Cardioversions and pacemaker insertions.  Observe and interpretation
of Exercise stress test, Nuclear Scans,  Echocardiographic studies and EKGs.  Discuss
management of Myocardial infarction, angina, Hypertension, Congestive Heart
failure.  Discuss clinical assessment, differential diagnosis and treatment Options
with Supervising Physician.

- **ENDOCRINOLOGY:**        **05/17/99 - 06/18/99**
**DR. JAMAL HAMMOUD: PHONE # 810 - 230 – 0788**
Patient's Physical assessment and medical record documentation. Observe and Review
Bone Density Testing Procedure and Thyroid Biopsy.  Discuss Management of

1 – 1 – 1/2

# MAIMOONA   HAKIM   HUSAIN M.D.
## 10077 Aberdeen drive, Grand Blanc, MI 48439
### (810)  695 – 8147

**Licensed Physician**

Sheet 2 of 4

Diabetes, Thyroid Diseases, Osteoporosis, Gynecomastia, Pituitary Tumors, Hirsutism and Adrenal gland Diseases.  Discuss clinical assessment, differential diagnosis and treatment Options with Supervising Physician.

- **OTOLARYNGOLOGY (E. N. T.):**                              04/19/99 - 05/16/99
  **DR. NASIR  AHMED:  PHONE # 810 - 230 – 0383**
  Patient's Physical assessment.  Discuss Management Epistaxis, Otitis Externa Otitismedia, Cerumen Impaction, Sinusitis, Vertigo, Tinitus, Rhinitis, Salivary gland Lesions, TMJ (Temporo mandibular joint) Syndrome, Sleep disorder, Laryngeal Lesion, Tonsillitis, Hoarseness, Neck masses  and  Hearing Loss.  Observe and Discuss (ENG).  Electronystagmogram Laryngscopy and Audiology Procedures.  Discuss clinical assessment, differential diagnosis and treatment Options with Supervising Physician.

- **PEDIATRICS / ADOLESCENTS:**                              01/11/99 - 03/06/99
  **DR. AFTAB  AFTAB:  PHONE # 810 - 686 - 7310**
  Patient's Physical assessment and medical record documentation.  Discuss the management of Asthma, Abdominal Pain, Skin Lesions, Nephritis, Diarrhae, Tibia Torsion, Bronchiolitis,  Ear Aches, Sore Throat, Muscle Aches and Pains.   Learn Immunization Guidelines, Newborn + Child examination and Choice of Antibiotics.  Discuss clinical assessment, differential diagnosis and treatment Options with Supervising Physician.

- **RADIOLOGY:**                                             11/30/98 - 01/10/99
  **DR. APPARAO  MUKKAMALA:  PHONE # 810 - 257- 9829**
  Participate in discussion with Supervising Physician/ Radiologist and Residents regarding the differential diagnosis of different radiological findings.  Observe the Radiologist reading and interpreting the X-rays set on the Overheads.  Attend Teaching Rounds of Radiology.  Prepare and Present  material as suggested  by the Radiologist.  Self Study and Review of Literature on Radiology in Library.

- **GASTROENTEROLOGY:**                                      10/26/98 - 11/29/98
  **DR. M. NAGARAJU:  PHONE  # 810 - 232 - 9178**
  Patient's Physical assessment and medical record documentation. Observe and assist on the following Gastroenterological procedure:  Colonoscopy, Flexible Sigmiodoscopy, Esophgo, gastroduoduoscopy, (ERCP) Endoscopic retrograde Choliangio Pancreaticography, (PEG) Percutaneous Endoscopic Gastrotomy Paracentesis.  Self Study by watching Educational Videos on: Achalasia, Esophagatis, Gerd, Dyspepsia, Gastrointestinal bleeding,  Hepatitis, Ulcerative Colitis, Crohn's Disease, Irritable Bowel Syndrome, Interferon. Discuss management of Esophageal lesion,  Hepatitis, pancreatitis, Upper G.I. Lesions, Lower G.I. Lesions.  Discuss clinical assessment, differential diagnosis and treatment Options with Supervising Physician.

1-1- 1/3

# M A I M O O N A   H A K I M   H U S A I N  M.D.
## 10077 Aberdeen drive, Grand Blanc, MI 48439
### (810)  695 – 8147

Licensed Physician

Sheet 3 of 4

## OBSERVERSHIP:

- **Pathalogy Department:**    July 97 – Sept 98
  **Hurley Medical Center, Flint, Michigan**
  Conducted Research & worked under Dr. Azher Qazi which resulted in paper "Trauma to the Heart in Vehicular Injuries".

- **Medicine – Pediatric Department;**    June 97 – Dec 97
  **Hurley Hospital, Flint, Michigan**
  Participated in lectures and outpatient clinic twice per week under Dr. Carravallah, Program Director, Med-Ped department.

- **Husain Arasutu, M.D., P.C.**    Jun 97 – June 98
  **28477 Hoover Road, Warren, Michigan 48093**
  Observed patients with Dr. Arastu on Saturdays. Discussed differential diagnosis, lab tests and treatment plan with with Dr. Arastu.

## Psychiatry Residency:
Fairlawn Center, Pontiac, MI -    July 87 - Jan 89

## Transitional Residency:
South Macomb Hospital, 11800 E. 12Mile Rd. Warren, MI    July 85 - April 86
Detroit Memorial Hospital, 1420 St. Antoine, Detroit, MI 48226

## Continuing Medical Education:

### Earned 561 C.M.E. Credits from 3/97 – 12/00 through the following Hospitals:

- Hurley Medical Center Education:
  Internal medicine, Pediatrics, Ob-Gyn, Grand rounds, Tumor board, Cancer center patient management, Trauma conference
- Genesys Regional Medical Center:
  Morning reports and Noon conferences
- McLaren Medical Center:
  Tumor Conference, Orthopedic, Medical & Surgical/ Trauma Grand Rounds.
- Others: Various Drug Manufacturing companies, American Health Consultant etc.

# M A I M O O N A   H A K I M   H U S A I N M.D.

10077 Aberdeen drive, Grand Blanc, MI 48439

(810)  695 – 8147

| – | – ¹/₄

Licensed Physician

Sheet 4 of 4

---

Education:
    Professional Certification Examination:
- E.C.F.M.G:  . Passed in February 1984

- F.M.G.E.M.: Part II: Scored 80 in Jan 85. Part I not required

- FLEX:        Passed in June 1986

  M.B.B.S.     1976 ~ 1982  (Graduation dated April 12, 1983).
     Nawabshah Medical College, Nawabshah, Pakistan.
- 2 Years Basic Science:   Anatomy, Histology, Physiology & Bio-Chemistry.
- 3 Years Clinical Hospital Rotation:  Medicine, ob-gyn, Pathology, Psychiatry, Pediatrics, E.N.T., Forsenic Medicine & Radiology

  Pre-medical College: 1973 - 1975
     St. Lawrence College, Karachi, Pakistan

  High school diploma: 1963 - 1973
     Habib Girls School, Karachi, Pakistan

Honors  &  Awards
- 6th position out of 170 students in Medical College Examination
- First division in all examination
- Title of "Best Student of the Class" in St. Lawrence College.
- Honors. in Physics & Chemistry in High School & Pre-med. exams.
- General secretary of  St. Lawrence College

Manuscript submitted on May 18, 1998 to department of Pathology,
    Hurley Medical Center, Flint, MI
    TOPIC:  BLUNT INJURY TRAUMA TO THE HEART
    Maimoona Husain M.D., Willys F. Mueller M.D., Qazi Azher M.D
    Hurley Medical Hospital & Michigan State University, Flint, Michigan

Resident Status: U.S. Permanent Resident

References:  See attached letter of Recommendation.

# MAIMOONA HAKIM HUSAIN M.D.

21725 Ruth, Farmington Hills, MI 48336   **248 476 – 3747   (248 739-0280 cell)**

**Licensed Physician**                                                    Sheet 1 of 2

## Experience:  Practicing Medicine as a Licensed Physician at the

St. Joseph Medical Center                                04/05-present
17950 Woodward Detroit MI 48203
Office of Dr. Abdullah Raffee                            01/00 – 06/02
5051 Villa Linde Suite 23 Flint MI 48532     worked periodically 06/02 – 1/05

## -  Medical Training/ Externship Program:             10/26/1998 - 12/07/1999

- Internal Medicine  + Geriatric:                            8/30/99 - 12/7/99
Dr. Abdullah  Raffee:   Phone # 810 - 733 - 8241

- Neurology:                                                          7/12/99 - 8/27/99
Dr. Ramesh  Chheda:  Phone  # 810 - 232  - 0040

- Cardiology + Internal Medicine:                          06/21/99 - 07/09/99
Dr. Mohammadali  Amlani:  Phone  # 810 - 732 - 5400

- Endocrinology:                                                   05/17/99 - 06/18/99
Dr. Jamal  Hammoud: Phone  # 810 - 230 - 0788

- Otolaryngology (E. N. T.):                                  04/19/99 - 05/16/99
Dr. Nasir  Ahmed:   Phone  # 810 - 230 – 0383

- Pediatrics / Adolescents:                                   01/11/99 - 03/06/99
Dr. Aftab  Aftab:   Phone # 810 - 686 - 7310

- Radiology:                                                          11/30/98 - 01/10/99
Dr. Apparao  Mukkamala:  Phone # 810 - 257- 9829

- Gastroenterology:                                              10/26/98 - 11/29/98
Dr. M. Nagaraju:  Phone  # 810 - 232 - 9178

## - Observership:

- Pathology Department: Hurley Medical Center, Flint, Michigan        July 97 – Sept 98
Conducted Research & worked under Dr. Azher Qazi, which resulted in a paper "Trauma to
the Heart in Vehicular Injuries".

- Medicine – Pediatric Department; Hurley Hospital, Flint, Michigan        June 97 – Dec 97
Participated in lectures and outpatient clinic twice per week under Dr. Carravallah, Program Director,
Med-Ped department.

- Husain Arastu, M.D., P.C.                                                        Jun 97 – June 98
28477 Hoover Road, Warren, Michigan 48093

## - Psychiatry Residency:                                        July 87 - Jan 89

Fairlawn Center, Pontiac, MI.

- **Transitional Residency:**                                   July 85  -  June 86
  South Macomb Hospital, 11800 E. 12Mile Rd. Warren, MI.
  Detroit Memorial Hospital, 1420 St. Antoine, Detroit, MI 48226

## Continuing Medical Education:
  Earned  **757** C.M.E. Credits from 3/97 – 12/04  through the following Hospitals:
  - *Hurley Medical Center Education: -* Internal medicine, Pediatrics, Ob-Gyn, Grand rounds, Tumor board, Cancer center patient management, Trauma conference
  - *Genesys Regional Medical Center: -* Morning reports and Noon conferences
  - *McLaren Medical Center: -* Tumor Conference, Orthopedic, Medical & Surgical/ Trauma Grand Rounds. *Others: -* Various Drug Manufacturing companies, American Health Consultant etc.

## Education:
  - **U.S.M.L.E.** :
    - Part I  (score **78**)  appeared in 1/05
    - Part II  (score **80**) appeared in 6/03
  - **FLEX:**       Passed in June 1986
  - **F.M.G.E.M.**: Part II: Scored 80 in Jan 85.
  - **E.C.F.M.G:** Passed in February 1984

  - **M.B.B.S.** Nawabshah Medical College, Nawabshah, Pakistan.        **1976 – 1982**
                                            (Graduation date:  April 12, 1983)
    - 2 Years Basic Science:   Anatomy, Histology, Physiology & Bio-Chemistry.
    - 3 Years Clinical Hospital Rotation:  Medicine, ob-gyn, Pathology, Psychiatry, Pediatrics, E.N.T., Forsenic Medicine & Radiology

  - Pre-medical College:   St. Lawrence College, Karachi, Pakistan        1973 – 1975
  - High school diploma:    Habib Girls School, Karachi, Pakistan        1963 - 1973

## Honors  &  Awards:
- 6th position out of 170 students in Medical College Examination,  First division in all examination, Honors in Physics & Chemistry in  Pre-med. Exams & High School
- Title of "Best Student of the Class" in St. Lawrence College, General secretary of St. Lawrence College

**Manuscript** Submitted on May 18, 1998 to department of Pathology, Hurley Medical Center, Flint, MI.
TOPIC:  BLUNT INJURY TRAUMA TO THE HEART.    Authors:  Maimoona Husain M.D., Willys F. Mueller M.D., Qazi Azher M.D., Hurley Medical Hospital & Michigan State University, Flint, Michigan

## Resident Status:   U.S. Permanent Resident

## References:   Dr. Abdullah Raffee, Dr. Ramesh Chheda, Dr. M.H. Amlani, Dr. Jamal Hammoud, Dr Nasir Ahmed, Dr. Aftab A Aftab, Dr. M.Nagaraju, Dr. Laura A. Carravallah, Dr. Qazi S. Azher ( all from Hurley Medical Center, Michigan); Dr. Husain Arastu, Dr. Sang C. Lee, Dr. pedro Franco, Dr.Bruce R. Deschere (all from South Macomb – St. John's Hospital in Metro Detroit) -  The letters are available on request.

# MAIMOONA HAKIM HUSAIN M.D.
### 10077 Aberdeen drive, Grand Blanc, MI 48439
### (810)  695 – 8147

Licensed Physician

Sheet 4 of 4

## Education:
### Professional Certification Examination:
- **E.C.F.M.G:** . Passed in February 1984

- **F.M.G.E.M.:** Part II: Scored 80 in Jan 85. Part I not required

- **FLEX:**        Passed in June 1986

### M.B.B.S.    1976 ~ 1982   (Graduation dated April 12, 1983).
Nawabshah Medical College, Nawabshah, Pakistan.
- 2 Years Basic Science:   Anatomy, Histology, Physiology & Bio-Chemistry.
- 3 Years Clinical Hospital Rotation:  Medicine, ob-gyn, Pathology, Psychiatry, Pediatrics, E.N.T., Forsenic Medicine & Radiology

### Pre-medical College: 1973 - 1975
St. Lawrence College, Karachi, Pakistan

### High school diploma: 1963 - 1973
Habib Girls School, Karachi, Pakistan

## Honors & Awards
- 6th position out of 170 students in Medical College Examination
- First division in all examination
- Title of "Best Student of the Class" in St. Lawrence College.
- Honors. in Physics & Chemistry in High School & Pre-med. exams.
- General secretary of St. Lawrence College

## Manuscript submitted on May 18, 1998 to department of Pathology,
Hurley Medical Center, Flint, MI
### TOPIC:   BLUNT INJURY TRAUMA TO THE HEART
Maimoona Husain M.D., Willys F. Mueller M.D., Qazi Azher M.D
Hurley Medical Hospital & Michigan State University, Flint, Michigan

## Resident Status: U.S. Permanent Resident

## References:   See attached letter of Recommendation.

MAIMOONA H. HUSAIN MD
10077 ABERDEEN DRIVE, GRAND BLANC, MI 48439

8/27/99

# CLINICAL ROTATION

## Medical Education Program Completed By Maimoona H. Husain M.D. During
### (10/26/1998 - 12/07/1999)

| DURATION/ DATES | ROTATION FIELD | *PHYSICIAN | WEEKS | Total Accumulated Weeks |
|---|---|---|---|---|
| 10/26/98 - 11/29/98 | GASTROENTEROLOGY | DR. M. NAGARAJU PHONE # 810 - 232 - 9178 | 5 WEEKS | 5 WEEKS |
| 11/30/98 - 01/10/99 | RADIOLOGY | DR. APPARAO MUKKAMALA PHONE # 810 - 257 - 9829 | 6 WEEKS | 11 WEEKS |
| 01/11/99 - 03/06/99 | PEDIATRICS / ADOLESCENTS | DR. AFTAB AFTAB PHONE # 810 - 686 - 7310 | 8 WEEKS | 19 WEEKS |
| 04/19/99 - 05/16/99 | OTOLARYNGOLOGY (E. N. T.) | DR. NASIR AHMED PHONE # 810 - 230 - 0383 | 4 WEEKS | 23 WEEKS |
| 05/17/99 - 06/18/99 | ENDOCRINOLOGY | DR. JAMAL HAMMOUD PHONE # 810 - 230 - 0788 | 5 WEEKS | 28 WEEKS |
| 06/21/99 - 07/09/99 | CARDIOLOGY + INTERNAL MEDICINE | DR. MOHAMMADALI AMLANI PHONE # 810 - 732 - 5400 | 3 WEEKS | 31 WEEKS |
| 07/12/99 - 8/27/99 | NEUROLOGY | DR. RAMESH CHHEDA PHONE # 810 - 232 - 0040 | 7 WEEKS | 38 WEEKS |
| 8/30/99 - 12/7/99 | INTERNAL MEDICINE + GERIATRIC | DR. ABDULLAH RAFFEE PHONE # 810 - 733 - 8241 | 12 WEEKS | 50 WEEKS |
|  |  |  |  |  |

* Please refer to attached Evaluation of Supervising Physicians.

MAIMOONA HUSAIN MD
10077 ABERDEEN DRIVE, GRAND BLANC, MI 48439

| | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|---|---|---|---|---|---|---|
| 7:00AM | cme | cme | cme | cme | cme | |
| 8:00AM | | | | | | |
| 9:00AM | | | | | | |
| 10:00AM | | | | | | |
| 11:00AM | | | | | | |
| 12:00AM | Tumor Board | Tumor Board | noon Conf. | noon Conf. | noon Conf. | |
| 1:00PM | out pt | | out pt | | | |
| 2:00PM | | | | | | |
| 3:00PM | Clinic | Teaching | Clinic | Teaching | Teaching | |
| 4:00PM | med/peds | rounds | Med/peds | rounds | rounds | |
| 5:00PM | | | | | | |
| 6:00PM | | | | | | |

In between Time I will spent on my project or read in library